**VAL DRUGS, INC., Plaintiff,**

**v.**

**James LYNN, Secretary of Housing and Urban Development, Washington, D. C., Defendant.**

**No. Civ-1973-310.**

United States District Court,
W. D. New York.

June 24, 1975.

Heller & Ramm, Buffalo, N. Y. (Edward Heller, Buffalo, N. Y., of counsel), for plaintiff.

Richard J. Arcara, U. S. Atty. (Roger P. Williams, Buffalo, N. Y., of counsel), for defendant.

CURTIN, Chief Judge.

This action was brought for payment under a policy of burglary insurance issued under the Federal Crime Insurance Program, 12 U.S.C. § 1749bbb–10a et seq. Plaintiff operates a drugstore in a shopping plaza in West Seneca, New York. Because that store had been repeatedly burglarized, it was impossible for plaintiff to obtain insurance coverage except at very high rates.

The Federal Crime Insurance Program was established by Congress to make available burglary insurance for residences and businesses which for a number of reasons were otherwise undesirable as risks to the private sector. The program, administered by the Secretary of Housing and Urban Development [HUD], was implemented through rules and regulations including policy applications and forms developed by the Federal Insurance Administration, a HUD agency. The statute directed HUD to promulgate rules and regulations to foster the use of more effective security devices to prevent theft loss. The encouragement of the use of more effective security devices was specifically related to this high risk insurance program.

On October 1, 1971 plaintiff obtained a "Commercial Crime Insurance Policy" available through the Federal Crime Insurance Program. That policy provided for protection against burglary. On October 23, 1971 and on January 10, 1972 plaintiff's place of business was burglarized. The thieves entered and left through a hole chopped in the roof. After each burglary plaintiff reported the loss immediately, both to the police and to the defendant. On July 10, 1972 plaintiff's claim under its crime insurance policy was denied by the Aetna Casualty and Surety Company, the carrier of the policy, because inspection of plaintiff's premises had ascertained that the locks on the exterior front and rear doors of plaintiff's premises did not meet the protective devices requirements called for in the policy. Specifically, the inspection reports of the insurance company indicated that the throw of the bolt on the door locks was less than the one inch required by the protective device requirements of the insurance policy.

Both parties have moved for summary judgment. Attached to those motions are copies of the insurance adjuster's inspection reports, which indicate that the burglary of October 23, 1971 was first referred to an adjuster on November 19, 1971. The adjuster's first report, dated November 22, 1971, stated that the adjuster would make an appointment to inspect the premises. On May 2, 1972 the adjuster made his second report of the burglary of October 23, 1971, which describes the premises, the ownership, the cause of loss and the damage, and also notes that the throw of the bolt on the front door lock was less than one inch. In response to this report, the adjuster's supervisor wrote in reference to both burglaries and said that diagrams, photographs and a complete description of protective devices should be obtained by May 12, 1972; and that this information is to ". . . go in the first report and should have been completed long ago." As for the January 10, 1972 burglary, the first report was made on March 14, 1972, and the second on May 3, 1972, repeating the information that the throw of the bolt on the front door lock was less than one inch. It states that the adjuster attempted to recheck this with more accurate measurements. The final report from the insurance adjuster, dated May 26, 1972, combines the first burglary in October of 1971 and the second burglary in January of 1972. It clearly shows that the protective device requirements were not met by plaintiff.

On July 10, 1972 the Aetna Casualty and Surety Company, by letter to Val

Drugs, Inc., denied both claims because the locks on the exterior front and rear doors did not meet the protective device requirements as called for in the insurance policy. The defendant denied payment because it construed the requirement as to locks as a warranty.

Plaintiff argues that it is entitled to payment, emphasizing the fact that the loss occurred by entry through the roof of the building. Even if the door locks had met the protective device requirements, the loss would have occurred. Plaintiff argues that the protective device requirements should be construed as a representation rather than a warranty. A representation, plaintiff alleges, is not a part of the insurance contract itself, but rather relates to the facts necessary to enable the insurer to decide whether he will accept the risk and at what premium. A warranty is a statement incorporated into the insurance contract which is essential to the validity of the contract itself. Plaintiff maintains that the protective device requirements are representations and, therefore, not essential to the validity of the contract.

The contract itself is a two-page document. Three-quarters of the second page is given to explaining the protective device requirements. The top of page 2 is entitled "ELIGIBILITY REQUIREMENTS AND UNUSUAL POLICY PROVISIONS." There are five such requirements. Number 3 states:

> To be eligible for insurance under the Federal crime insurance program, the insured premises MUST meet the requirements for protective devices established by the Federal Insurance Administration for that type of property. A list of these requirements is printed on the back of this form. (Emphasis in the original.)

Immediately below these eligibility requirements, the protective device requirements are explained. At the bottom of that explanation is a section entitled "CERTIFICATION BY APPLICANT." This certification states:

> I certify, under penalty of Federal law for fraud or misrepresentation as set forth in 18 U.S.C. 1001, (1) that the statements I have made in this Application, including the signature date set forth below, are true and correct to the best of my knowledge and belief, (2) that I have read the eligibility requirements above and the protective device requirements on the back of this form, and (3) that the insured premises meet such requirements.

Plaintiff also represented that the producer of the policy had advised plaintiff about the required protective devices. The certification continues in another paragraph:

> I further agree to make the insured premises available for inspection in connection with this policy at any reasonable time; and I understand that if at the time of such inspection the insured premises are found not to be protected in the manner required, this Policy will be considered void from its inception and only the portion of the premium not absorbed by administrative expenses in connection with the issuance of such policy and the inspection will be refunded.

A similar certification is provided by the insurance broker. The certifications were signed by plaintiff and his insurance broker.

 The court finds that the protective device requirements were essential parts of the insurance contract. The legislative history of Public Law 91–609, pursuant to which the Federal Crime Insurance Program was established, indicates that it was the intent of Congress to make the protective device requirements a condition for providing this special insurance. The report of the House of Representatives stated:

> The committee does not expect the Secretary to reduce Federal property insurance rates to a point where they become an incentive for property owners to neglect reasonable precautions to avoid losses. A provision in this title requires the Secretary to promul-

gate regulations establishing minimum standards for protective devices as a condition for providing burglary and theft insurance and also requires property owners periodically to report compliance with current requirements as a condition of retaining the crime insurance. The Secretary is authorized to prescribe appropriate terms and conditions that would reduce property insurance rates in recognition of the utilization of proper maintenance and appropriate loss prevention devices.

1970 U.S.Code Cong. and Admin. News at p. 5608.

Therefore, the court finds that since the protective device requirements were not met, the insurance company was correct in refusing to pay on plaintiff's claim arising out of the first burglary. This conclusion is amply supported by the case law. *Phoenix Insurance Co. v. Ross Jewelers, Inc.*, 362 F.2d 985 (5th Cir. 1966), and *Home Insurance Co. v. Ciconnett*, 179 F.2d 892 (6th Cir. 1950).

 The court also finds, however, that there was inordinate delay on the part of the insurance company in processing plaintiff's claim of loss on the first burglary. Defendant had 79 days between the first burglary and the second burglary to inspect the premises and deny the insurance. However, it appears that an actual inspection of the premises did not take place until well after the second burglary. In fact, plaintiff was not advised of a denial of coverage until July 10, 1972 when the insurance company finally informed plaintiff that his claim was denied. Had the defendant acted promptly on plaintiff's first claim, plaintiff would have had the opportunity either to secure coverage elsewhere or to make the necessary adjustments to come within the protective device requirements. It is well settled that the acts of an insurer which led the insured to believe he is covered under the policy estop the insurer from denying coverage under the policy. *Hartford Life Annuity Insurance Co. v. Unsell*, 144 U.S. 439, 12 S.Ct. 671, 36 L.Ed. 496 (1892); *Reliance Insurance Company v. The Yacht Escapade ex The Thor II*, 280 F.2d 482 (5th Cir. 1960); *and generally*, 43 Am.Jur.2d *Insurance* § 1092 (1969). In this case, the insured's failure to process plaintiff's claim and to inform plaintiff that he was not covered within a reasonable period of time estops the company from denying coverage on the second burglary. Moreover, the court notes that the insurance company had knowledge of facts sufficient to impose upon them a duty to make diligent inquiry into the plaintiff's claim. The fact that the insured was burglarized in October 1971 put the insurer on inquiry, and in effect amounted to notice of the failure of plaintiff to conform to the protective device requirements since an inquiry pursued with ordinary diligence and understanding would have disclosed the same. 43 Am.Jur.2d *Insurance* § 1070 (1969). Because of this, the insurer's failure to act on plaintiff's claim constituted a waiver by the insurance company of the plaintiff's failure to meet the protective device requirements and, therefore, the court again is led to the conclusion that plaintiff is entitled to recover under the insurance policy for losses suffered in the second burglary.

The motions of plaintiff and defendant are denied in part and granted in part in accordance with this opinion. The sum of $4,342.14 is awarded to plaintiff to cover loss brought on by the second burglary. The plaintiff's action for the sum of $2,910.93 for the loss of October 23, 1971 is dismissed. The Clerk is directed to enter judgment for the plaintiff for the sum of $4,342.14, and for the defendant dismissing plaintiff's action for $2,910.93.

The court will defer ruling on whether interest should be awarded. The parties should attempt to agree on this question. If they cannot, briefs by each side shall be filed not later than July 21, 1975.

So ordered.